**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**HANK JACOBUS**,

     **Plaintiff,**

**v.**                                           **Case No. 3:12-cv-02032**

**MICHAEL HUERTA,**
**FAA Administrator**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

Plaintiff, Hank Jacobus ("Jacobus"), filed a *pro se* Complaint against Michael Huerta, in his official capacity as Administrator of the Federal Aviation Administration (FAA), alleging claims of stalking, retaliation, invasion of privacy, negligence, and defamation. (ECF No. 2). Jacobus subsequently amended the Complaint, restating the same causes of action and adding alleged violations of his constitutional rights guaranteed by the Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution. (ECF No. 23).

Currently pending before the Court are Plaintiff's Petitions for Injunction, (ECF Nos. 18, 24); Plaintiff's Petition to Add a Defendant, (ECF No. 26); and Defendant's Renewed Motion to Dismiss the Complaint. (ECF No. 25). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and is referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, the undersigned recommends

that Plaintiff's Petitions for Injunction and to add a Defendant be denied and his Complaint, as amended, be dismissed in its entirety, with prejudice, for failure to state a claim for which relief may be granted.

## I.   <u>Fact Summary</u>

Jacobus alleges that he has been the target of constant government-facilitated surveillance and harassment over the past three and a half years. (ECF Nos. 2, 18, 19, 23). According to Jacobus, on September 12, 2009, he was involved in an argument with an unidentified pilot at a small, private South Charleston, West Virginia airport. Jacobus reports that he objected to the pilot's "low banking takeoffs," (ECF No. 2 at 2, ECF No. 19 at 1), and asked the pilot "if he'd be safer" when flying over nearby homes. The pilot "refused and was very angry." (ECF No. 2 at 2). Jacobus then complained to "the local tower," as well as the owner of the airport. (*Id.*). Jacobus claims that since this incident, he has been subjected to continuous surveillance by aircraft, satellite, and unmanned drones, (ECF No. 2 at 2; ECF No. 8 at 2; ECF No. 18 at 1-2; ECF No. 19 at 1-2; ECF No. 23 at 1), police surveillance (ECF No. 8 at 3), and harassment in the form of airplanes regularly passing overhead or "buzzing" his home. (ECF No. 2 at 2-3; ECF No. 8 at 1). Jacobus alleges that both private planes and commercial jetliners have followed him around the country, repeatedly flying over all nine of the residences he has held in the last three years. (ECF No 2. at 3-5; ECF No. 2-1). Moreover, drones, spy planes, and military aircraft have been deployed to spy on him when he works on his house or goes on camping vacations. (ECF No. 2 at 2; ECF No. 8 at 2; ECF No. 23 at 1).

Jacobus contends that following his argument in September 2009, the pilot reported Jacobus to the FAA as a security threat. (ECF No. 18 at 1; ECF No. 19 at 2: ECF No. 23 at 1). Jacobus complains that the FAA failed to investigate the pilot's charges

before it "accepted a serious false accusation against [him]."[1] (ECF No. 19 at 1). Moreover, according to Jacobus, the FAA failed to contact the Federal Bureau of Investigation (FBI) so that a proper investigation could be conducted. (ECF No. 18 at 1). Instead, Jacobus believes that the FAA recklessly forwarded his name to the Transportation Safety Administration (TSA) or the Terrorist Screening Center (TSC),[2] which resulted in his name being placed on a federal security/terrorist watch list. (ECF No. 20 at 2, ECF No. 23 at 1). Jacobus complains that despite having written to the FAA on six occasions, he has never been informed of the evidence that led to his name being placed on the watch list, nor has he been provided with an opportunity to defend himself. (ECF No. 18 at 1, ECF No. 23 at 1-2). Jacobus also alleges that the FAA "gave out [his] exact locations to [General Aviation][3] pilots everywhere [he] went," (ECF No. 18 at 1), which "caused local pilots to buzz [his] roofs everywhere he lived and traveled." (ECF No. 19 at 2).

## II.    The  Evolution of Plaintiff's Allegations and Procedural History

In his original Complaint filed on June 13, 2012, Jacobus alleged that the FAA "incited private pilots in 4 states, by knowingly [spreading] false rumors, to harass him daily." (ECF No. 2 at 1). According to Jacobus, these pilots spied on him and routinely buzzed his home after being told by a few FAA "offenders" that Jacobus had threatened the owner of a South Charleston airport. Jacobus contended that these false rumors were spread in retaliation for his 2009 complaint about the unidentified pilot's unsafe take-

---

[1] At a scheduling conference held on October 5, 2012, Jacobus suggested that the unidentified pilot colluded with a retired FAA employee to report him as a terrorist threat.

[2] Jacobus identifies the agency as the Terrorists Screening Agency or TSA, which does not exist.

[3] According to the Aircraft Owners and Pilots Association, "[g]eneral aviation is all civilian flying except scheduled passenger airline service." Aircraft Owners and Pilots Association, What is General Aviation, at 1, *available at* http://www.aopa.org/info/what_ga.pdf. Examples of general aviation include flying for purposes of "overnight package delivery," "a weekend visit back home," "emergency medical evacuation," "inspection trips to remote construction sites," "aerial application to keep crops healthy" and "airborne law enforcement to keep the peace." *Id.*

offs. Jacobus also claimed that the FAA intentionally routed jetliners over his various residences and sent drones and spy planes to follow him. Finally, Jacobus indicated that the FAA was tracking his every movement, surmising that GPS or "guidance systems" were being used for real-time stalking. (*Id.* at 3-5). For relief, Jacobus asked that the Court order the FAA to "tell all pilots" that Jacobus had never made any threats. (*Id.* at 5).

In a document entitled "Addition 2," filed on July 24, 2012, Jacobus claimed that law enforcement officers had begun to follow him as a result of the false rumors started by the FAA. (ECF No. 8 at 3). He complained that "loud choppers" hovered "exactly overhead" and drones incessantly spied on him, and that all of this surveillance was subsidized by "Homeland Security." (*Id.*).

On August 24, 2012, Defendant filed a Motion to Dismiss Jacobus's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6), or for a More Definite Statement (ECF No. 12). Plaintiff filed a response to the Motion to Dismiss and also filed a Petition for an Injunction. (ECF Nos. 18, 19, 20). In the Petition for Injunction, filed on September 10, 2012, Jacobus alleged that the FAA provided General Aviation pilots with his address "everywhere [he] went" and continued to route commercial jetliners over his residences and campsites to harass him. (ECF No. 18 at 1). Jacobus asserted that while camping 450 miles away from home, he learned that he had been placed on "watch lists as a threat." (*Id.*). He argued that the Government used satellites to surveil him without due process of law and in violation of the federal anti-stalking statute. Once again, Jacobus claimed that law enforcement was able to actively watch him with funds supplied through "a Homeland Security Grant." (*Id.* at 2). In his request for relief, Jacobus sought a court order removing his name from any and all watch lists and to "stop the FAA calling on [him]." (*Id.* at 3).

In a "Final Amendment," filed on September 13, 2012, Jacobus contended that his Fourth Amendment right to be free of warrantless searches was being violated by the Government. (ECF No. 19). He repeated that the FAA accepted a false accusation against him, which resulted in his inclusion on a national terrorist watch list. (*Id.* at 2).  Jacobus reasserted his claim that the FAA continued to spread false rumors that he threatened an airport owner and provided private pilots with his addresses so that they could harass and stalk him. In Jacobus's view, he had been "secretly charged with a crime, (making terrorist threats), serious enough to cause this intense, three year, open surveil [sic]. He's been secretly found guilty, with no due process. Punishment was weekly low flying gas cans <u>exactly</u> over his homes and more already described." (*Id.*)  He asked the Court to order his name removed from the watch list and to hear his constitutional claims. (*Id.* at 3).

The undersigned conducted an initial status conference on October 5, 2012. After a lengthy discussion with the parties, the Court denied Defendant's dismissal motion, without prejudice, but granted his motion for a more definite statement. (ECF No. 22). Thus, Jacobus filed an Amended Complaint on November 5, 2012. (ECF No. 23). In this pleading, Jacobus reiterated that the FAA accepted false accusations against him and, without investigating their accuracy, reported him to the Terrorist Screening Agency. As a result, Jacobus "has unjustly been [placed] on the terrorist watch list and punished, ever since" with relentless surveillance. (*Id.* at 1). Jacobus also contended that multiple unidentified FAA staff members inflicted their own punishment on him by diverting and directing commercial jetliners over his locations in three states for over 35 months. (*Id.* at 3).  In his request for relief, Jacobus asked the Court to order the FAA or Terrorist Screening Agency to explain to him why he was placed on the terrorist watch list, to notify

him that he had been removed from the watch list, "to cease notifying small plane pilots of his whereabouts," and to correct the false rumors about him. (*Id.*). In addition, Jacobus sought money damages in an amount between "$1.00 to $9,999" or as set by the Court. (*Id.*).

On November 14, 2012, Jacobus filed a second petition for injunctive relief. (ECF No. 24), in which he requested that the Court order the FAA to stop notifying "small plane pilots" of his whereabouts. Again, Jacobus claimed that he was improperly placed on a watch list for "known or highly suspected terrorists" with "no police or FBI investigation and much evidence to the contrary." (*Id.*). The following day, Defendant renewed his Motion to Dismiss. (ECF No. 25). Jacobus did not respond to the renewed motion, but did file a petition seeking to add as a defendant the "high altitude control center boss in the Indianapolis radar center," who allegedly supervises the air traffic controllers that route Air Force jets and other aircraft over Jacobus's current residence 50-75 times each day and "nearly exactly over every place [Plaintiff] goes in Cabell County, moments after he arrives, including Lowes, Barboursville Park, Wal Mart, a home on Cyrus Creek, a Winfield trailer dealership, Nationwide insurance office, State Farm insurance office, two campgrounds, and more." (ECF No. 26 at 1).

The undersigned has meticulously reviewed Jacobus's filings to identify factual allegations and separate them from mere conclusory allegations. In doing so, three essential factual claims emerge that form the basis of Jacobus's complaint, including the following:

1.    Jacobus had an argument with a private pilot in September 2009;

2.    After the argument, small planes began to buzz his house and commercial airliners and military aircraft repeatedly flew over him wherever he lived or traveled; and

3.    He observes aircraft, satellites, unmanned drones, and law enforcement personnel lurking around him on a regular basis.

Using these assertions as a spring board, Jacobus leaps to the following conclusions:

1.    The FAA communicates false rumors about him to private pilots so that they will harass him;

2.    The FAA intentionally routes commercial airliners and military aircraft over his homes to harass him;

3.    The FAA illegally tracks his whereabouts; and

4.    The FAA has placed his name on a national terrorist watch list without due process of law.

The remaining allegations asserted by Jacobus fall in two categories. The first category includes details supporting his factual contention that he is harassed and surveilled; such as, dates, times, coordinates, and descriptions of aircraft flying or hovering overhead. The second category includes information irrelevant to his claims, but perceived by him to support his conclusions; such as, published reports of corruption, drug use, and retaliation within the FAA. Jacobus sues the FAA on causes of action sounding in tort, including "invasion of privacy, stalking, harassment, defamation," and negligence; for violations of the federal anti-stalking statute, 18 U.S.C. § 2261A; and for violations of his constitutional rights. (ECF No. 18 at 3).

## III.    <u>Standard of Review</u>

Defendant argues, *inter alia*, that Jacobus's complaint should be dismissed because he fails to state a claim for which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009),

*quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d

929 (2007). The Supreme Court explained the "plausibility" standard in *Iqbal*, stating:

> A claim has facial plausibility when the plaintiff pleads factual content that
> allows the court to draw the reasonable inference that the defendant is
> liable for the misconduct alleged. The plausibility standard is not akin to a
> "probability requirement," but asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint pleads facts that are
> "merely consistent with" a defendant's liability, it "stops short of the line
> between possibility and plausibility of 'entitlement to relief.'

*Iqbal,* 556 U.S. at 678, *quoting Twombly*, 550 U.S. at 556-57 (internal citations omitted).

Determining whether a complaint states a facially plausible claim for relief is a "context-

specific task that requires the court to draw on its judicial experience and common

sense." *Id.* at 679 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157-158 (2nd Cir. 2007)). "[W]here

the well-pleaded facts do not permit the court to infer more than a mere possibility of

misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled

to relief." *Iqbal,* 556 U.S. at 678 (quoting Fed.R.Civ.P. 8(a) (2)). While the Court is

required to accept as true well-pled factual allegations, it need not accept legal

conclusions that are "couched as ... factual allegation[s]," *Id.* at 678 (quoting *Bell Atlantic*

*Corp v. Twombly*, 550 U.S at 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), or

conclusory factual allegations without reference to actual events, *United Black*

*Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979). Simply stated, conclusory

allegations are not the same as "well-pled" facts and are not entitled to the assumption of

truth. *Iqbal,* 556 U.S. at 679. In addition, "clearly baseless" claims, such as those that are

"fanciful," "fantastic," or "delusional," may be dismissed as factually frivolous. *Denton v.*

*Hernandez*, 504 U.S. 25, 32-33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). While the court is

required to liberally construe a *pro se* complaint, *Erickson v. Pardus,* 551 U.S. 89, 94, 127

S.Ct. 2197, 167 L.Ed.2d 1081 (2007), the pleading still must contain sufficient "well-pled"

factual allegations to support a valid legal cause of action. The court may not rewrite the complaint to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), develop the plaintiff's legal theories for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

IV.   <u>**Plausibility Review**</u>

When assessing Jacobus's complaint under the plausibility standard, the undersigned **FINDS** that the complaint fails to state a claim for which relief may be granted because it consists almost entirely of conclusory and clearly baseless allegations, rather than well-pled facts. In order to proceed with his lawsuit, Jacobus must provide a factual bridge linking the events that he describes in his pleadings to wrongdoing by the FAA, which is the only named defendant. A "sheer possibility" that the FAA has acted illegally is not enough to state a plausible entitlement to relief. Even when accepting as true Jacobus's assertions that private planes buzz his house and commercial and military aircraft and satellites repeatedly pass over his locations, these claims do not give rise to a reasonable inference that the FAA is engaging in defamation, harassment, or surveillance. Likewise, the mere presence of aircraft and law enforcement personnel in Jacobus's vicinity does not, without more, lead to the conclusion that he is on a federal terrorist watchlist.

### A. FAA Surveillance and Harassment

Jacobus contends that his nightmare began after he had an argument with a pilot at a small private airport. He does not identify the pilot or provide any verifiable connection between the pilot and FAA officials. He accuses unnamed "FAA offenders" of

spreading false rumors about him but fails to provide any supporting details. He claims he is being tracked without a warrant and presumes that this is done through FAA "guidance systems," but again offers no factual basis for that presumption. He fails to submit a rational explanation for how the FAA can track his movements, on a minute-by-minute basis, without the use of a tracking device on his vehicle, in his home, or on his person; he does not claim to have found any such device. His allegations are broadly based on rumor, speculation, fantasy, and conjecture. Despite being told that the FAA is not the government agency responsible for the terrorist watch list or terrorist surveillance activities, Jacobus maintains his complaint against the FAA only; primarily, on the basis that the FAA controls air traffic and Jacobus believes that he is being subjected to constant aerial surveillance.

Jacobus's contention that the FAA is responsible for the alleged surveillance and harassment is particularly implausible when considering the FAA's mission and function.[4] Contrary to Jacobus's apparent belief, the FAA is not a law enforcement agency and is not responsible for aviation security.[5] The FAA has no authority to monitor terrorist activity or conduct surveillance of suspected terrorists, and no corresponding budget or infrastructure. Similarly, the FAA does not maintain its own terrorist watch list; thus, no process or mechanism exists for FAA officials to maintain and update Jacobus's addresses and circulate them to private pilots. Moreover, while the FAA certifies, authorizes, and licenses drones, other aircraft, and pilots, the FAA is not authorized to

---

[4] *See* http://www.faa.com/about

[5] *See* http://www.faa.com/about/history/historical_perspective. In November 2001, the Aviation and Transportation Security Act established the Transportation Security Administration (TSA), the government agency charged with overseeing and promoting aviation security. More than a decade ago, the FAA officially transferred all aviation security responsibilities to the TSA.

conduct aerial surveillance of individuals.[6]

Instead, the major responsibilities of the FAA include promoting civil aviation safety, operating a system of air traffic control and navigation for both civil and military aircraft, and developing and carrying out programs to control aircraft noise and other environmental effects of civil aviation. Given these responsibilities, it is extremely unlikely that the FAA would facilitate "buzzing" or harass an individual by using commercial and military aircraft. Jacobus's contention that the FAA has allowed air traffic controllers, for more than three years, to continuously route and re-route air traffic over Jacobus's person, regardless of his whereabouts, the weather conditions, predetermined flight plans and patterns, military operations, air space congestion, the schedules of commercial airlines, and the safety of airline passengers, is utterly fantastical.

Many of Jacobus's other allegations relating to FAA inspired surveillance and stalking are equally bizarre. For example, Jacobus claims that a "lite up drone" was sent to fly over his campsite when he was 100 miles from home, (ECF No. 2 at 2); "drones are heard over [his] roof 24/7," (ECF No. 8 at 1); his letters and emails are continuously monitored by unknown persons; he is "watched by the minute by high powered cameras," (ECF No. 18 at 2); satellites that can "read newspapers and 'see' through roofs and walls" are fixed on his home constantly, (ECF No. 19 at 1); air force jets are directed over every place he goes in Cabell County, appearing just moments after he arrives, (ECF No. 26); law enforcement officers take extreme measures to ensure that Jacobus knows they are following him, (ECF No. 28 at 2), and this "stalking," which Jacobus concedes has likely

---

[6] See 49 U.S.C. § 40101, et seq., as amended by the FAA Modernization and Reform Act of 2012. *See also* Federal Aviation Administration, *FAA Makes Progress with UAS Integration.* ("The FAA's sole mission and authority as it focuses on the integration of unmanned aircraft systems is safety.").

cost millions of dollars, is paid for by the Department of Homeland Security.

Allegations that are "fanciful" or outlandish may be disregarded; a complaint that relies on such allegations may be dismissed as factually frivolous. *Denton v. Hernandez*, 504 U.S. at 32-33. "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Id.; see also Tooley v. Naplitano*, 586 F.3d 1006, 1009-10 (D.C. Cir. 2009) (claims of constant surveillance by government were "flimsier than doubtful or questionable ... essentially fictitious); *Strong v. United States*, 2012 WL 202780 (S.D.Cal Jan. 23, 2012) (Plaintiff's claim that he had been "labeled as an enemy of the United States" due to his drug addiction and was being surveilled by unmanned drones was dismissed frivolous); *Raiford v. FBI*, 2010 WL 6737887 (D.S.C. Nov. 17, 2010) (claims of stalking by aircraft were frivolous); *Marshall v. Green*, 2010 WL 1959514 (W.D. Ky. May 17, 2010) (claims of "bizarre conspiracy theories" related to government stalking were frivolous). Here, the undersigned **FINDS** that Jacobus's claims of harassment, stalking, and surveillance by the FAA are unsupported, conclusory and factually frivolous; thus, his complaint should be dismissed.[7]

## B. FAA Relation to the Terrorist Watchlist

Jacobus's claim that the FAA made an unsubstantiated report that led to his inclusion on a national terrorist watch list is similarly improbable. While Jacobus is

---

[7] In *Tooley v. Napolitano*, 586 F.3d at 1009-10, the United States Circuit Court for the District of Columbia addressed claims similar to those raised in this case. The Court determined that it lacked subject matter jurisdiction over the complaint because the allegations were "patently insubstantial," and, thus, presented "no federal question suitable for decision." *Id.* (quoting *Best v. Kelly*, 39 F.3d 328, 330 (D.C. Cir. 1994)). In reaching its conclusion, the Court commented on the both the bizarre motivation alleged by the Plaintiff for the government's undertaking of his surveillance and the incredible combination of "sloth, fanaticism, insanity and technical genius" required to carry it out.

correct that such a watch list exists, he demonstrates no understanding of how the list is populated or used.[8] In light of the purpose, function, and protocols of the Terrorist Watchlist, and given that the FAA has no authority or control over the list, Jacobus's claims cannot withstand plausibility review and should be dismissed.

In September 2003, Homeland Security Presidential Directive—6 (HSPD—6) was adopted with the express intent to "develop, integrate, and maintain thorough, accurate, and current information about individuals known or appropriately suspected to be or have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism" for screening, diplomatic, intelligence, law enforcement, military, immigration, and other protective processes.[9] HSPD—6 authorized the Attorney General to implement an organization that would consolidate "the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." *Id.* As a result, the Terrorist Screening Center (TSC), a multi-agency organization, was established and placed under the administration of the FBI. The TSC reviewed dozens of separate watch lists maintained by various government agencies and consolidated the lists into a single national "database of identifying information about those known or reasonably suspected of being involved in terrorist

---

[8] The undersigned takes judicial notice of information contained in federal governmental agency reports and postings relating to the purpose, creation, and function of the Terrorist Screening Database. *See United States v. Chester*, 628 F.3d 673, 692 (4th Cir. 2010) (taking judicial notice of domestic violence statistics contained in reports from the CDC, DOJ Bureau of Justice Statistics, and the National Institute of Justice); *Fisher v. City of North Myrtle Beach*, 2012 WL 3638776, at *1 n.2 (D.S.C. Jul. 26, 2012) ("The court may take judicial notice of factual information located in postings on governmental websites."); *see also Ibrahim v. Department of Homeland Sec.*, 669 F.3d 983, 988-90 (9th Cir. 2012) (citing extensively to federal reports by the Department of Homeland Security, Department of Justice-Office of the Inspector General, Government Accountability Office, as well as statements made at congressional hearings); *also Shearson v. Holder*, --F.Supp.2d--, 2011 WL 4102152 at *15 (N.D.Ohio Sept. 9, 2011) (Court may take judicial notice of and use public records in deciding a motion to dismiss); *In re Katrina Canal Breaches Consol. Lit.*, 533 F.Supp.2d 615, 631-33 (E.D. La. 2008).

[9] Homeland Security Presidential Directive 6 (HSPD-6), Integration and Use of Screening Information (Sept. 16, 2003), in Compilation of Homeland Security Presidential Directives, 31-32 (January 2008).

activity," called the Terrorist Screening Database (TSDB) or Terrorist Watchlist.[10] The TSC is the global authority for watchlisting and identifying known and suspected terrorists. It also acts as a central clearinghouse "where all law enforcement and government screeners [can] access the best information about a potential person of interest."[11]

The information entered into the TSDB is derived from two sources; the Terrorist Identities Datamart Environment (TIDE) database maintained by the National Counterterrorism Center (NCTC) and the FBI's Automated Case Support system.[12] The TIDE database is the "central repository of information on international terrorist identities"[13] and is intended to be the only source for Watchlist information relating to international terrorists. "The remaining information in the TSDB pertains solely to domestic terrorism,"[14] a matter that falls within the jurisdiction of the FBI. Information pertaining to suspected domestic terrorists is collected and stored by the FBI and "provided to the TSC directly from the FBI's Automated Case Support system."[15]

When an agency identifies an individual as a potential terrorist and seeks to have

---

[10] Terrorist Screening Center, http://www.fbi.gov/about-us/nsb/tsc/tsc_mission.

[11] Terrorist Screening Center, http://www.fbi.gov/about-us/nsb/tsc.

[12] Office of the Inspector General, Department of Homeland Security, DHS' Role in Nominating Individuals for Inclusion on the Government Watchlist and Its Efforts to Support Watchlist Maintenance ("DHS-OIG Report") at 9 (September 2011).

[13] NCTC, TIDE FAQ's at 1 (February 2008); *see also* Sharing and Analyzing Information to Prevent Terrorism: Hearing Before the H. Comm. On the Judiciary, 111th Cong. 21-22 (2010)

[14] Domestic terrorism "means activities that (A) involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and (C) occur primarily within the territorial jurisdiction of the United States.  18 U.S.C. § 2331.

[15] DHS-OIG Report at 9.

the individual included on the Terrorist Watchlist, the agency must nominate the individual to the TSC.[16] Ninety-five percent of all nominations made to the TSC come from the FBI, Department of State, Defense Intelligence Agency, and Central Intelligence Agency,[17] with "the vast majority of [the] watchlist information [coming] from the NCTC."[18] Nominations from the Department of Homeland Security (DHS), which include all TSA nominations, account for less than 1% of the nominations submitted to the TSDB. Significantly, there is no evidence that the FAA is either an originator or a nominator of terrorist information. Rather, when FAA staff "identifies information about known or suspected terrorists *with pilot licenses*, they notify the TSA." (emphasis added).[19] Thus, in the normal course of business, the FAA's involvement in populating the Terrorist Watchlist is limited to reporting pilots suspected of terrorist acts to the TSA. The TSA then forwards the report to the DHS, and the DHS may nominate the pilots to the TSC for possible inclusion in the TSDB. Given this process, it is unlikely that the FAA gave Jacobus's name to the TSA for nomination to the Terrorist Watchlist as Jacobus is not a pilot. Notably, Jacobus offers no factual support for his conclusory allegation that the FAA identified him as a potential terrorist threat to the TSA or TSC.

Jacobus's belief that he was placed on the Watchlist without evidence or investigation likewise flies in the face of well-documented TSDB screening procedures.

---

[16] Follow-up Audit of the Terrorist Screening Center,  Audit Report 07-41, Department of Justice, Office of the Inspector General, September 2007  ("2007  DOJ Audit Report").

[17] The DHS Process for Nominating Individuals to the Consolidated Terrorist Watchlist, Department of Homeland Security, Office of the Inspector General, OIG-08-29 (DHS-OIG-08-29), February 2008 at 3.

[18] U.S. Government Accountability Office, Report to Congressional Requestors, Terrorist Watchlist: Routinely Assessing Impacts of Agency Actions since the December 24, 2009 Attempted Attack Could Help Inform Future Efforts ("GAO Report") at 6 (May 2012).

[19] DHS-OIG-08-29 at 9.

Contrary to Jacobus's supposition, "[a]ll nominations from source agencies to the consolidated watchlist are vetted through the FBI or the ... NCTC."[20] According to a 2007 Department of Justice Audit Report:

> Analysts at NCTC or the FBI review the nomination information and decide whether or not the person is an appropriate candidate for inclusion on the consolidated watchlist. This review includes an evaluation of the information supporting the nomination, an examination of the quality and accuracy of the identifying information, and an examination of whether sufficient identifying information is available. The FBI and NCTC are responsible for providing the TSC an unclassified subset of identifying information for individuals known or suspected to be or have been involved in activities related to terrorism.

Accordingly, the prerequisites for watchlisting demand some level of investigation by the NCTC or the FBI. TSC Director Timothy Healy explained in a statement to the House Judiciary Committee:

> First, the biographic information associated with a nomination must contain sufficient identifying data so that a person being screened can be matched to or disassociated from a watchlisted terrorist. Second, the facts and circumstances pertaining to the nomination must meet the reasonable suspicion standard of review established by terrorist screening Presidential Directives. Reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual "is known or suspected to be or has been engaged in conduct constituting, in preparation for, in aid of or related to terrorism and terrorist activities." The reasonable suspicion standard is based on the totality of the circumstances in order to account for the sometimes fragmentary nature of terrorist information. Due weight must be given to the reasonable inferences that a person can draw from the available facts. Mere guesses or inarticulate "hunches" are not enough to constitute reasonable suspicion. A TSC interagency group composed of members from the intelligence and law enforcement communities issued clarifying guidance to the watchlisting community in February 2009.[21]

---

[20] 2007 DOJ Audit Report.

[21] Statement of Timothy Healy, Director, Terrorist Screening Center, FBI, Before the House Judiciary Committee, March 24, 2010 ("Healy 2010 Statement to Judiciary Committee"); *See also Latif v.Holder*, 686 F.3d 1122, 1125 n.2 (9th Cir. 2012).

Accordingly, Jacobus's unsupported contention that he was placed on the Terrorist Watchlist without an FBI investigation so dramatically varies from the established protocols that it is implausible.

Finally, although Jacobus claims to be the subject of egregious surveillance and harassment operations, none of the facts he alleges are consistent with having been placed on the Watchlist. Watchlist information is not reviewed by government agencies in order to identify individuals for the initiation of surveillance. Instead, the TSDB is a searchable database designed to respond to specific queries by certain screening agencies seeking to confirm whether or not particular individuals have previously been suspected of terrorist activity. The TSC distributes information from the TSDB only "to frontline screening agencies that conform with the missions and legal authorities under which those agencies operate."[22] "To support agency screening processes, TSC sends applicable records from the TSDB to screening and law enforcement agency systems based on the agency's mission responsibilities and other factors."[23] The four primary U.S. Government Systems supported by the TSDB include: (1) the Department of State's Consular Lookout and Support System for passport and visa screening; (2) DHS's TECS system for border and port of entry screening; (3) No Fly and Selectee Lists used by TSA for airline passenger screening; and (4) the FBI's NCIC Known or Suspected Terrorist File (formerly the Violent Gang/Terrorist Organization File (VGTOF)) for domestic law enforcement screening.[24] Each system has different criteria for inclusion, which are "tailored to the

---

[22] William J. Krouse & Bart Elias, Congressional Research Service, Terrorist Watchlist Checks and Air Passenger Prescreening ("CRS Report"), at 4  (Dec. 30, 2009),

[23] GAO Report at 39-40.

[24] Healy 2010 Statement to Judiciary Committee.

mission, legal authorities, and information technology requirements of the department or agency that maintains the system. Accordingly, each of these systems contains a different subset of data from TSDB."[25] For instance, for aviation security, the TSA uses the No-Fly and Selectee Lists to screen airline passengers. The No-Fly List is a subset of the TSDB that includes individuals who are prohibited from receiving a boarding pass for any flight to, from, over, or within the United States. The Selectee List, a different subset of the TSDB, identifies individuals flagged to undergo enhanced or secondary security screenings before their eligibility to receive a boarding pass is determined.[26]

As stated *supra*, information from the Watchlist is also available electronically to federal, state, county, and local law enforcement agencies through various databases, including NCIC, Law Enforcement Online (LEO), Regional Information Sharing System (RISS), and the Homeland Security State and Local Intelligence Community of Interest (HS-SLIC). The TSC provides training to police dispatchers and law enforcement officers on how to promptly notify TSC of encounters with individuals on the Terrorist Watchlist.[27] In a November 2007 statement before the Committee on Homeland Security, U.S. House of Representatives, Glenn A. Fine, Inspector General of the U.S. Department of Justice explained how terrorist information exported from the TSDB is used by law enforcement personnel as part of their regular duties, stating:

> When a name appears to be a match against the terrorist watchlist, requestors receive a return message through their database informing them of the preliminary match and directing them to call the TSC. When a call is

---

[25] Healy 2010 Statement to Judiciary Committee.

[26] *See No-Fly Report,* DHS Privacy Office, April 27, 2006.

[27] Statement of Timothy J. Healy, Director, Terrorist Screening Center Before the Senate Homeland Security and Governmental Affairs Committee, December 9, 2009 ("Healy 2009 Statement to Homeland Security Committee").

received, TSC staff in the 24-hour call center assist in confirming the subject's identity.

Those matches may be actual watchlist subjects, individuals misidentified to a terrorist identity, or someone mistakenly included on the watchlist. In responding to such a call, the TSC Call center staff search the consolidated database and other databases to determine if a terrorist watchlist identity match exists.

Records within the consolidated watchlist database also contain information about the law enforcement action to be taken when encountering the individual. This information is conveyed through "handling codes or instructions ... the FBI's handling codes are based on whether there is an active arrest warrant, a basis to detain the individual, or an interest in obtaining additional intelligence information regarding the individual.

Notwithstanding law enforcement's use of the Watchlist, names or other identifying information contained in the TSDB are not routinely distributed or otherwise made available to federal, state, or local law enforcement agencies for generalized surveillance.

Bearing in mind this framework, it is clear that Jacobus provides no facts upon which the Court can reasonably infer that (1) the FAA nominated him for inclusion on the Terrorist Watchlist; (2) his information is actually in the database; or (3) the harassment he claims to suffer is a result of his being watchlisted. This is true for several reasons. First, the alleged justification for his inclusion in the database does not pass muster. Even if Jacobus argued with a private pilot over the safety of his take-offs and threatened the airport owner over the pilot's behavior, these acts, standing alone, do not constitute domestic terrorism or make Jacobus suitable for inclusion on a watch list that is reserved for international and domestic terrorists. Second, the FAA has historically played an insignificant role in both the population and use of the Terrorist Watchlist. To have nominated Jacobus, or even suggested his name to the TSA, would have been a highly unusual action by the agency. Moreover, if Jacobus's name had been nominated by the

FAA or TSA, the FBI would have been required to investigate the circumstances underlying the nomination and confirm that a reasonable suspicion existed for labeling Jacobus a domestic terrorist. Third, Jacobus fails to describe any circumstance that would tend to suggest that his name is on the list. The Watchlist is primarily used for screening purposes. In order for screening to occur, an individual must engage in activity that elicits the need to screen. In this case, Jacobus denies any encounters with the FBI and alleges no contacts with law enforcement, such as traffic stops or arrests, which might trigger the screening of his name. He makes no claim that he was ever prohibited from boarding an airplane, subjected to an unusually intense security screening at an airport, detained at a U.S. border, or denied a passport or visa. Thus, Jacobus fails to offer even a scintilla of evidence that would lend credence to his theory that he is on the Watchlist.

Without some tangible basis to conclude that Jacobus was nominated or suggested by the FAA for inclusion and is, in fact, on the Terrorist Watchlist, Jacobus is also unable to sustain this claim against the FAA. Consequently, the undersigned **FINDS** that Jacobus fails to state a claim that is facially plausible against the FAA related to the Terrorist Watchlist and his complaint should be dismissed.

## V. <u>Other Grounds for Dismissal</u>

In addition to the lack of facial plausibility, Jacobus's complaint should be dismissed because (1) he alleges causes of action that are unavailable to him; (2) he has named the wrong party as the defendant; and (3) he seeks relief that cannot be granted.

### A. Claims for Money Damages

Jacobus seeks money damages for the following tortious activity: "invasion of privacy, stalking, harassment, defamation," and negligence as a result of the FAA

reporting him as a terrorist suspect without first conducting an investigation. (ECF No. 18 at 3). According to Jacobus, he has standing to pursue these claims against the FAA under the Federal Torts Claim Act (FTCA). (ECF No. 18 at 2). In addition, Jacobus seeks damages for alleged violations of his constitutional rights by FAA employees under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 395 –97, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

### 1. Federal Torts Claim Act

Generally, the United States and its agencies are exempt from suit, absent a waiver of sovereign immunity. Through the FTCA, 28 U.S.C. §§ 1346(b), 2671-2680, the United States has waived its immunity against claims "for money damages ... for injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment," 28 U.S.C. § 1346(b)(1). The FTCA allows the United States to be sued "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and is the exclusive money remedy for non-constitutional torts committed by federal employees acting within the scope of their federal employment. 28 U.S.C. § 2679. The only proper defendant in an FTCA claim is the United States. 28 U.S.C. § 2674; *Webb v. Hamidullah*, 281 Fed. Appx. 159, 161 n.4 (4th Cir. 2008).

Before filing a FTCA complaint in court, a claimant must exhaust his administrative remedies by "present[ing] his claim to the appropriate administrative agency for determination." *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir. 1994) (citing 28 U.S.C. § 2675(a)). Pursuant to the applicable federal regulations, a claim is "deemed to have been presented when a Federal agency receives from a claimant ... an executed Standard Form 95 or other written notification of an incident, accompanied by a

claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident." 28 C.F.R. § 14.2(a); *see also Ahmed*, 30 F.3d at 517 ("[I]n order to present a personal injury claim to the appropriate administrative agency, the claimant must present it to the agency in writing by means of an SF 95 or an equivalent; the writing must include a claim for money damages in a sum certain; if the claimant is represented, the representative's authorization must be demonstrated; and these matters must be accomplished within two years of the incident."). "Sovereign immunity can be waived only by the sovereign; the circumstances of its waiver must be scrupulously observed and not expanded by the courts." *Kokotis v. U.S. Postal Service,* 223 F.3d 275 (4th Cir. 2000) (citing *United States v. Kubrick,* 444 U.S. 111, 117-18, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979)). Where a plaintiff fails to exhaust his claim administratively by complying with the mandatory prerequisites, the district court must dismiss the lawsuit for lack of jurisdiction. *Henderson v. United States,* 785 F.2d 121, 123 (4th Cir. 1986). ("[T]he requirement of filing an administrative claim is jurisdictional and may not be waived."); *See also Xiteng Liu v. U.S. Citizenship and Immigration Services, Texas Service Center,* 317 Fed.Appx. 361, 362 (4th Cir. 2009) (citing *Plyler v. United States,* 900 F.2d 41, 42 (4th Cir. 1990). Moreover, the Fourth Circuit has declined to read a futility exception into the exhaustion requirement of the FTCA. *Xiteng Liu,* 317 Fed.Appx. at 362; *Howard v. Milam,* 1990 WL 74309 at *4 (4th Cir. May 10, 1990).

In the present case, Jacobus has failed to exhaust his administrative remedies. Jacobus admittedly has not submitted a Form SF 95 and presents no evidence of having submitted a reasonable equivalent. Jacobus erroneously argues that "the SF 95 can be waived" and that "the U.S. Attorney could do another one day 'probe' at the local airport

and find the same thing again, faster than making Plaintiff file an SF-95 to get what's already known," (ECF No. 18 at 1, 3), but states no legitimate ground for excusing his failure to comply with the statutory mandates.

Even if Jacobus had exhausted his administrative remedies, most of his FTCA claims would likely still fail. "[F]or many torts the United States has not waived its sovereign immunity through the Tort Claims act." *Maron v. United States*, 126 F.3d 317, 321 (4th Cir. 1997); *see* 28 U.S.C. § 2680. Specifically, under the "intentional tort exception," plaintiffs are generally barred from raising claims "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h). Likewise, under the "discretionary function exception," the FTCA does not permit suits "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As a result of these exceptions, Jacobus's "defamation" claim is clearly precluded and his "harassment" and "stalking" claims are tenuous at best. For these reasons, the undersigned **FINDS** that Jacobus's non-constitutional torts asserted under the FTCA should be dismissed.[28]

### 2. Bivens Action

A *Bivens* action entitles a plaintiff "to recover money damages for injuries suffered as a result of [a federal employee's] violation" of certain constitutional rights. *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396 (1971). A

---

[28] Jacobus also fails to name the proper party under the FTCA. Despite having been advised of the FTCA's requirement that the United States be the named defendant, and having been given the opportunity to amend his complaint, Jacobus has not corrected the error.

claim under *Bivens* must be asserted against the federal actor in his individual capacity and may not be maintained against the United States, federal agencies, or public officials acting in their official capacities. *See FDIC v. Meyer,* 510 U.S. 471, 475, 484–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *Reingold v. Evers,* 187 F.3d 348, 355 n. 7 (4th Cir.1999).

In the present case, Jacobus sues only Michael Huerta in his official capacity as Administrator of the FAA. He does not allege that Mr. Huerta violated his rights or was personally involved in any of the challenged activities. Jacobus claims that a few "FAA offenders" have provided his name and location to General Aviation pilots, yet Jacobus fails to identify those individuals in any meaningful way and makes no effort to join them as defendants. Jacobus does seek to amend his complaint and add the "high altitude control center boss" in the Indianapolis radar center for being "in charge of routing" Air Force jets over or near his home and "every place [he] goes in Cabell County;" however, Jacobus implicates the control center boss in his supervisory capacity, rather than as an individual directly involved in committing the misdeeds. To the extent that Jacobus seeks to hold the control center boss liable under a theory of *respondeat superior*, such a claim is not available under *Bivens. Ashcroft,* 556 U.S. at 677. On the other hand, if Jacobus suggests that the control center boss is liable for the injuries inflicted by his subordinates on the basis of "supervisory indifference," then Jacobus must allege and ultimately establish the presence of three elements: (1) the supervisor had actual or constructive knowledge that his employee was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response to the actions of the employee was so inadequate as to constitute deliberate indifference or tacit authorization of the conduct; and (3) an "affirmative causal link" exists between the supervisor's inaction and the alleged constitutional injury. *Shaw v.*

*Stroud,* 13 F.3d 791, 799 (4th Cir.1994). Ignoring for a moment the sheer logistical impossibility of the scheme described by Jacobus, he does not make a *prima facie* showing of supervisory liability. Jacobus does not allege that the control center boss had actual or constructive knowledge that his subordinates were stalking and harassing Jacobus by routing and re-routing aircraft over him, or that the boss was deliberately indifferent to the conduct. Even more fundamental to the analysis, Jacobus fails to identify a constitutional right that is violated by the alleged routing of aircraft over his locations. *See, e.g., Vaziri v. Central Intelligence Agency,* 2010 WL 1558942 (E.D.Ky April 19, 2010) (claims of invasion of privacy, harassment, stalking, intimidation with intent to cause emotional distress are "common State offense or torts, not federally based claims."). In the absence of behavior by a federal agent that rises to the level of a violation of a constitutional right, Jacobus cannot maintain a *Bivens* action.

Therefore, the undersigned **FINDS** that Jacobus fails to state a claim under *Bivens* against Michael Huerta in his official capacity and fails to allege sufficient facts to join the Indianapolis radar control center boss as an individual defendant.

### 3. Alleged Violations of 18 U.S.C. § 2261a (Stalking)

Jacobus also contends that the FAA has violated 18 U.S.C. § 2261A,[29] a federal criminal statute that prohibits and punishes interstate stalking. *Kruska v. Perverted Justice Foundation Incorporated Org.*, 2010 WL 4791666, at *8 (D. Ariz. Nov. 18, 2010); *Tomel v. Ross*, 2009 WL 3824742, at *5 (D. HI Nov. 16, 2009). "Possible punishments for violations of § 2261A(2), as outlined in 18 U.S.C. § 2261(b), include prison time, a monetary fine, or both." *Kruska*, 2010 WL 4791666, at *8; *Tomel*, 2009 WL 3824742, at

---

[29] Throughout his pleadings, Jacobus incorrectly cites to 18 U.S.C. § 2261, which relates to interstate domestic violence. (ECF Nos. 2, 8, 18 and 19). However, it is clear from the context that he intends to refer to 18 U.S.C. § 2261A.

*5. While "a criminal statute may provide an implied private right of action if Congress so intended in enacting the criminal state," *Fox v. Tippetts*, 2009 WL 3790173, at *3-4 (W.D. La. Nov. 10, 2009) (quoting *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988)), nothing in 18 U.S.C. § 2261A suggests that it is more than a "bare criminal statute." *Fox*, 2009 WL 3790173, at *3-4 (quoting *Cort v. Ash*, 422 U.S. 66, 79, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)). Therefore, Jacobus has no cause of action under § 18 U.S.C. § 2261A. *See Dorr v. Ford Motor Co.*, 2011 WL 5857886, at *9; *Kruska*, 2010 WL 4791666, at *8; *Tomel*, 2009 WL 3824742, at *5; *Haffke v. Discover Financial Services*, 2010 WL 5572765, at *1 (E.D. Tex. Dec. 17, 2010).

Therefore, the undersigned **FINDS** that Jacobus fails to state a claim under 18 U.S.C. § 2261A.

### B. Claims for Prospective Relief

Jacobus's claims for prospective relief also must fail because he has not demonstrated that action or inaction on the part of the FAA violates or will violate his rights under the constitution, laws, or treaties of the United States. Under *Bivens*, Jacobus must show a constitutional violation by the FAA, which he has not done. Assuming, *arguendo*, that a few "FAA offenders" notified private pilots of Jacobus's addresses, conducted aerial surveillance, or routed aircraft over his locations, Jacobus fails to demonstrate how those actions violate his Fourth, Fifth, Ninth or Fourteenth Amendment rights. Jacobus does not allege that these acts have deprived him of his life, liberty, or property; they do not constitute unreasonable searches and seizures, *see California v. Greenwood*, 486 U.S. 35, 42 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (citing *California v. Ciraolo,* 476 U.S. 207, 213-14, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)); and they do not unequivocally implicate any other constitutional guarantee.

In regard to Jacobus's complaints regarding the Terrorist Watchlist, he has simply sued the wrong party. The FAA does not maintain or control the list, and either the FBI or NCTC is responsible for conducting the vetting process for each nominee to the list. Ultimately, the TSC makes the final decision on whether an individual's information is entered into the TSDB and only the TSC can remove the information. *See Latif v. Holder,* 686 F.3d 1122, 1128 (9th Cir. 2012). If state or local law enforcement officers choose to follow Jacobus, the FAA has no authority to stop them. Consequently, even if Jacobus is entitled to the prospective relief he seeks, the FAA is not capable of providing it.

Similarly, to pursue a claim under the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-06, Jacobus must establish that he is "a person suffering legal wrong because of agency action,[30] or adversely affected or aggrieved by agency action within the meaning of a relevant statute;" **and** the agency action is either made reviewable by statute or is a final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704. Agency action that does not fall within one of these two categories is not reviewable by the district court under the APA. *Invention Submission Corp. v. Rogan,* 357 F.3d 452, 459-60 (4th Cir.2004). Jacobus accuses certain "FAA offenders" of harassing and surveilling him, but he makes no claim that a specific action by the FAA sanctions or authorizes the alleged harassment and surveillance. In any event, Jacobus makes no showing that he has exhausted his remedies with the FAA and that he has no other adequate remedy at law. To the contrary, if Jacobus filed a properly styled complaint, which included well-pled facts showing harassment or other intentional wrongdoing by FAA employees, Jacobus could seek relief under the FTCA or *Bivens.*

---

[30] The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *See* 5 U.S.C. § 551(13).

Moreover, even if the FAA nominated Jacobus for inclusion on the Terrorist Watchlist, that nomination does not constitute a final agency action. *See Dalton v. Specter,* 511 U.S. 462, 468-69, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994). Any nomination to the list by the FAA requires vetting by the FBI or NCTC before submission to the TSC. Ultimately, the FBI, NCTC, or TSC can reject the nomination. Thus, the final action in regard to populating the TSDB rests with an agency other than the FAA.

For these reasons, the undersigned **FINDS** that Jacobus fails to state a claim against the FAA for prospective relief; therefore, his complaint should be dismissed.

## VI.  **Proposal and Recommendations**

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the presiding United States District Judge accept and adopt the findings herein and **RECOMMENDS** that:

1.   Plaintiff's Petitions for Injunction (ECF Nos. 18, 24) be **DENIED**;

2.   Plaintiff's Petition to Add a Defendant (ECF No. 26) be **DENIED**;

3.   Defendant's Renewed Motion to Dismiss be **GRANTED** (ECF No. 25); and

4.    Plaintiff's Complaint and Amended Complaint (ECF Nos. 2, 23) be **DISMISSED, with prejudice,** for failure to state a claim.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Federal Rules of Civil Procedure 6(d) and 72(b), the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed

Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff and counsel of record.

**FILED:** February 22, 2013.

Cheryl A. Eifert
United States Magistrate Judge